Filed 2/19/26  P. v. Meeks CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084296 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2100469) |
| CHRISTIAN SCOTT MEEKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Valerie A. Navarro, Judge.  Affirmed as modified.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christian Scott Meeks on various charges related to human trafficking, pimping, pandering, assault, and dissuading a witness. Meeks asserts there was insufficient evidence to support four of the nine convictions; that his trial counsel provided ineffective assistance by failing to object to certain testimony offered by an expert witness on the commercial sex industry; and that the trial court erred during sentencing.  We modify the

judgment to stay the punishment on two of the counts, pursuant to Penal Code section 654,[1] and otherwise affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Between 2018 and 2021, Meeks recruited, or attempted to recruit, several women, including one undercover police officer, to work for him as commercial sex workers. In 2021, the People charged Meeks with:

Count 1—human trafficking, victim V.B. (§ 236.1, subd. (b));

Count 2—human trafficking, victim M.S. (§ 236.1, subd. (b));

Count 3—pimping, victim M.S. (§ 266h);

Count 4—pandering, victim M.S. (§ 266i);

Count 5—assault by means likely to produce great bodily injury, victim M.S. (§ 245, subd. (a)(4));

Count 6—assault by means likely to produce great bodily injury, victim J.L. (§ 245, subd. (a)(4));

Count 7—dissuading a witness, victim J.L. (§ 136.1, subd. (b));

Count 8— pandering, victim J.L. (§ 266i); and

Count 9—pandering, undercover officer (U.C.) (§ 266i).

### A. Evidence Presented at Trial

The primary victim, M.S., did not testify at trial. The prosecution presented its case through the testimony of several Riverside County Sheriff's Officers, including an investigator that testified as an expert witness, deputies that contacted Meeks and M.S. at various times, a deputy that acted as the U.C. officer identified in count 9, and two other alleged victims, V.B. and J.L.

---

1    Further unspecified statutory references are to the Penal Code.

### 1. Expert Testimony About the Commercial Sex Industry

At the outset of the case, Riverside County Sheriff's Investigator Bridgette Recksiek provided some general information to the jury regarding the commercial sex industry.[2]

Recksiek explained that "commercial sex work is basically workers who advertise themselves for sex in exchange for anything of value or money," and that a "pimp" is a person that maintains control over commercial sex workers for their own financial benefit. A given pimp may use one or more common tactics to maintain such control. For example, a pimp may make women feel like they are in a traditional relationship with him and then use that relationship to manipulate or control them, while another may use more direct and forceful physical or mental control. Some may use a combination of tactics, or transition from one type of tactic to another as the relationship progresses.

"The life" refers to the subculture of the commercial sex industry, in which a pimp will generally set certain house rules that female sex workers must follow in exchange for promises of protection and being taken care of. The rules may include a quota, or amount that a female sex worker must make each day, and additional rules regarding the female's relationship with the pimp and others, such as "do not speak unless spoken to" and "do not make eye contact with a male that is not their pimp." There may also be punishment associated with breaking these rules.

Female sex workers often refer to their pimp as "Daddy." The female sex worker that has been working for a pimp for the longest, or that is most trusted by the pimp, may be referred to as the "bottom girl." The group of

---

2    Recksiek testified several times throughout the trial. We discuss additional testimony, *post*, but focus here on the background she provided.

women working under a pimp is generally referred to as his "stable." The bottom girl may recruit and train other women in the stable, making sure that they know the rules. The pimp may also recruit girls directly, either online or in areas where they commonly work.

Female sex workers generally advertise online, either on websites or using social media. They typically use acronyms or terms that do not directly refer to sexual services but are generally known in the industry. The pimp may assist with making these ads. Pimps often give the women in their stable nicknames, which the women then use in the ads. They may also have the women get a tattoo that correlates to their moniker, symbolizing their relationship. Tattoos of crowns are commonly utilized to designate that a particular female belongs to, or is controlled by, a pimp.

Pimps will move around, from one motel to another. They may share a room with a female sex worker or may have multiple rooms. Typically, the pimp will be nearby, readily accessible to protect their female workers. When the woman goes on a "date," the pimp will keep most or all the cash she receives. The pimp may treat her by paying to get her hair or nails done and will also typically provide food or a minimal amount of money meant for food. This keeps the women dependent on the pimp.

Although a female sex worker could theoretically walk away in most instances, many feel pressured to stay for security, or because of threats against themselves or their family members. For these same reasons, female sex workers are rarely willing to talk to police or testify against their pimps.

**2.     V.B.**

V.B. met Meeks in 2018. V.B. was struggling with homelessness and had recently lost custody of her two children. A friend told V.B. that she had been making money by posting ads for sexual services, so V.B. decided to post an ad herself. Around the end of November or early December, she began

4

speaking with an individual named "Rico," whom she subsequently identified as Meeks, on a social media application called Tagged.  Meeks wanted V.B. to work for him.

V.B. agreed to meet Meeks in person.  She thought that Meeks could help her make more money, but also wanted to get to know him as a person before agreeing to any such arrangement.

A couple days before Christmas Eve, Meeks picked V.B. up at a house in Lancaster where she was staying with relatives.  His friend was driving, and the friend's girlfriend was also in the car.  V.B. knew that Meeks was from Moreno Valley, but she understood that they would just be hanging out near Lancaster.  After a while, V.B. realized that they were getting on the freeway.  She asked Meeks where they were going, and he said they were going to Morena Valley to get a room.  V.B. said she could not leave Lancaster and had things she needed to take care of at home.  Meeks said he would take her home the next day.

The driver left Meeks and V.B. at a motel.  They were alone in the room.  After about an hour, Meeks started talking to V.B. about "how the game works," meaning how to post ads, and how to respond to men that responded to her ads.  He suggested that she put more nudity in her photographs.  V.B. felt like she was stuck in the room.  She tried to tell Meeks that she wanted to leave and raised her voice to attract attention, but he continued to talk about the ads.  Meeks took additional pictures of V.B. and posted an ad on a website for the Inland Empire area.  V.B. tried to delete the ad but Meeks would not let her.

V.B. received an inquiry on the ad.  Meeks told her how to respond and what to charge.  Eventually, V.B. agreed to meet the man in the parking lot.  She did not want to do it and felt like she was being forced.  When the man

arrived, she went out to the car and Meeks watched from inside the motel room. V.B. had agreed to perform a sex act for $60 but she told the man that she really did not want to and they just talked.

The man gave V.B. the agreed upon $60. Meeks took it as soon as V.B. returned to the motel room. Meeks said he would save it until she made more, and then he would help her buy more clothes and things. At that point, V.B. got "really upset." She asked for the money back and they started to argue. At some point, V.B. left the motel room and they continued to argue in the corridor just outside. V.B. said she was going to call the police and Meeks said she "wasn't going to do that." He then took V.B.'s iPad, smashed it against the railing of the stairs, and used it to hit V.B. in the face. Meeks ran off and V.B. called 911. The People played a recording of the 911 call for the jury.

### 3. J.L.

J.L. was living at a motel in Moreno Valley for about three months in early 2020. Meeks and M.S. lived in the motel room next door to her. J.L. knew Meeks as "Rico" or "Active." J.L. believed that Meeks was physically assaulting M.S. On one occasion, she heard screaming, someone being slammed against the wall, and M.S. yelling for help. After, M.S. appeared in the doorway with a black eye and asked J.L. to call the police. The police came and talked to M.S.

J.L. was aware that there was prostitution going on in the room, in part because M.S. asked J.L. to join her "plenty of other times." M.S. referred to Meeks as "Daddy," a common term for a pimp. Meeks tried to give J.L. flowers. She refused them and said that she had a boyfriend. J.L. believed the gesture was an effort by Meeks to get her to work for him.

By March 22, 2020, J.L. had moved to another motel down the street. J.L. walked across the street to the liquor store around noon, and

6

encountered Meeks and M.S. As she walked into the store, she got into "a physical argument" with Meeks. Meeks said she was going to get her "ass whooped" and that she "already [knew] what time it was." J.L. finished her shopping and walked out of the store with some items in her hands. Meeks told her to drop her stuff. She took that to mean there was going to be a fight, so she threw her items into the grass. Meeks called her a snitch and other derogatory terms. J.L. said that she was pregnant and Meeks said that he did not care.

M.S. and J.L. "squared up" in the grass, but Meeks was upset that M.S. was not really fighting or hitting J.L. so he "jumped in, grabbed [J.L] by [her] hair, and dragged [her] all the way to the door." He started kicking J.L. and "throwing [her] everywhere." J.L. was eventually able to get away and run across the street back to the motel. As she was leaving, Meeks said "that's what [you] get. That's what [you] need." J.L. was taken to the hospital and had injuries including bruises and bite marks.

J.L. testified that she did not want to come to court to testify because she was afraid of Meeks and everything that had happened. She was wearing an ankle monitor and explained that it was so the People could track her location leading up trial.

### 4. Undercover Deputy (U.C.)

U.C. had previously been assigned to the Riverside County Anti-Human Trafficking Task Force. In January 2021, U.C. assisted the task force by going undercover to contact Meeks on Snapchat, a social media platform with direct messaging. U.C. spoke with Meeks on Snapchat, and at some point, the conversation moved to direct text messages and conversations over the phone. Meeks asked U.C. to video call with him but she made excuses as to why she could not.

Meeks told U.C. that his name was Rico.  When U.C. asked Meeks what he did for a living, Meeks said that he "motivates, inspires people to get it."  He also told her that "everyone needs a little guidance and unconditional loyalty."  This was significant because this language was typical examples of grooming used by pimps.

After talking for a while, U.C. told Meeks that she was thinking of going back to stripping, and that her goal was to make money to get an apartment and a car.  Meeks told her that he wanted to meet in person to "interview" her, which U.C. understood to mean that he wanted to find out what she was willing to do.  Meeks also said that he was "setting things up for you as we speak."  U.C. said she was thinking of starting an OnlyFans page, another social media platform where account holders often post sexually explicit content for money, and Meeks told her that she was "on the right track."

When they spoke on the phone, Meeks talked to U.C. about "setting up some dates," which she took to mean prostitution.  Meeks said "The sky is the limit.  It's up to you and your work ethic."  Meeks did not ever offer U.C. information about a stripping job, or any other legal form of employment.

When U.C. asked Meeks to be more specific about what they were going to do, Meeks told her to call, and also asked her to prove that she was not a cop by sending a video saying, "I'm not a cop" and showing her nipples.  Eventually, Meeks told U.C. that they needed to meet in person.  He said, "It seems like you want to talk about prices and money and cuts.  I will not do that here.  I don't trust it."  The conversation began to trail off at that point.  U.C. did not agree to meet Meeks in person and she believed he suspected that she was an undercover police officer.

### 5. Police Contact with J.L., M.S. and Meeks

Deputy Ruiz made contact with J.L. at the motel in Moreno Valley on January 23, 2020. J.L. expressed concerns that there was yelling as if someone was getting beat up in the room next to hers.

Recksiek, Ruiz and Deputy Sheriff Rodriquez returned the next day. Meeks exited the room that he and M.S. had been staying in as Rodriquez approached. Meeks was sweaty and nervous, and his voice was shaking. The door was open and Rodriquez could see M.S. inside. M.S. was emotional and crying. There was bruising on her face near her eye and the eye itself was red due to broken blood vessels. M.S. had a crown tattoo on her face near the eye, which is indicative of prostitution subculture, and specifically of a woman working for a man, or pimp. Rodriguez conducted a sweep of the room and found a spiral notebook, assorted condoms, and a large can of pepper spray. Both Recksiek and Rodriguez testified that those items were consistent with prostitution occurring in the room.

Recksiek retrieved video surveillance from the motel. She noted that it showed Meeks coming and going, at times with M.S. In one video, shown to the jury, a car arrives, M.S. exits, goes around the car and opens the door for Meeks, and then quickly walks away. She does not make eye contact with any of the other men that are present. Recksiek testified M.S.'s behavior suggested that she had been taught the rules, including how she was supposed to show respect for Meeks.

Ruiz also spoke with J.L. in March 2020, after the incident outside the liquor store. He took photographs of J.L.'s injuries and the People submitted those photos to the jury.

### 6. Deputy Daniel Engels

Deputy Engels was part of the anti-human trafficking task force in early 2020. He testified, consistent with Recksiek's testimony, about some of

9

the general concepts and terminology. He discussed "the life" and the dynamics between female sex workers, pimps, and "Johns," or customers. He also explained that female sex workers are often vulnerable in many ways. They may be young, previously victimized, and lacking in love or support and a stable family or homelife. Many have had experience with foster or group homes.

Engels also discussed the different kinds of tactics used by pimps to control women, as well as the "house rules" system. He noted that a female sex worker may be physically assaulted if they break their pimp's rules. He explained that most women start in "the life" at a very young age, and are vulnerable, making them easily swayed or exploited. Because they start so young, they often don't know anything else, which can make it difficult for them to leave or get out of the lifestyle. The pimps generally keep most or all of the money, making it difficult for the women to have the resources to leave. The women may also fear physical violence or retaliation.

Engels made contact with M.S. at the motel on January 24, 2020. M.S. was 19 years old at the time. Engels conducted a search and found several ads for sexual services depicting M.S. and using the name Ruby Diamond.

In December 2020, Engels attempted to contact M.S. in an undercover capacity, posing as a potential client while calling the phone number on one of her ads. He arranged to meet M.S. for a car date. Before meeting, M.S. asked for a picture of his face, his penis, and the $120 agreed upon for the date. Engel sent the requested photos (not of himself) and M.S. provided an address. Another deputy drove to the location and when M.S. came to the vehicle, police detained her and obtained a download of her phone. The People provided the jury with a transcript of the text messages and Engels walked through the exchange, explaining what occurred.

Engels also assisted with a traffic stop involving Meeks on February 3, 2021.[3] During the stop, deputies confiscated a phone from Meeks and likewise obtained a download of data. The phone rang when Deputy Engels called a number used by U.C. to contact Meeks.

### 7. Cellular Phones and Notebook Obtained From M.S. and Meeks

Recksiek also testified about evidence obtained from M.S. and Meeks, including data from their cellular phones and the notebook found in the motel room.

The phone taken from M.S. was associated with the e-mail account Redroseinc@gmail.com. This was significant because Red Rose Entertainment was a label that Meeks used for the women working for him. The police were able to capture data from the iCloud backup on the phone. There were several pictures of M.S. and Meeks at various motels in the region. One of the photos included an emoticon of a king wearing a crown and the words, "what a life." Recksiek testified that crowns are often a sign of power and are also used to signify that someone is a pimp. There was another photo of Meeks holding fanned out money in his hand.

There were also various ads offering sexual services from M.S. in the iCloud account. Recksiek explained one of the ads, noting that there was an emoticon of a car and a car plate that read $80. It also had wording, including "serious inquires only, gentlemen," that was suggestive of offering sexual services to men. The words "QV for a hundred" appeared at the bottom, and Recksiek testified that this meant "quick visit," or about 15 minutes. There was at least one photo of M.S. performing a sexual act with a

---

3   Engels testified this stop occurred in February 2020, but elsewhere in the record, it appears the stop occurred in 2021.

11

male.  There was also a photo of M.S. from around January 20, 2020, in which her face and lip appeared swollen.  There was also a search from that same day for "how to get rid of a bleeding eye."

The phone taken from Meeks was associated with the e-mail account Activeonshit@gmail.com.  The search history on the phone revealed visits to various websites known for posting advertisements for commercial sex.  One had a saved account belonging to "Rico Sevanni."  Another had an account under the username Rubydiamond2000.  Ruby was a nickname for M.S.  The password for the account was "304pgoforever."  Recksiek testified that 304 was a reference to "hoe" (based on the word spelled when the numbers are upside down on, for example, a pager) and "pgo" was an acronym for "pimping going on."

Several of the pages included ads for M.S.  There was also a history of message exchanges indicating M.S. was meeting with men for sexual services, and notifications from Cash App where Meeks received payments in amounts often associated with sex work.  Finally, the location of the phone over time matched up with the ads and was consistent with Meeks and M.S. traveling the prostitution circuit together.[4]

In another exchange, Meeks wrote "I need a fee to incorporate you to where it's really at.  I have the proper guidance, knowledge, and energy to give you to make sure you have the motivation you need."  Recksiek explained that, in her experience, this was Meeks "trying to get someone to come conduct commercial sex work for him."  Meeks went on to state, "I gotta

_____

4      Recksiek explained that the "circuit" is a group of cities that prostitutes frequently travel to for work.  It includes the Inland Empire, Orange County, San Diego, Los Angeles, and then it extends up through Northern California, oftentimes into Las Vegas and Arizona.

have the real, the loyalty, the trust," and Recksiek explained that pimps often use such language in recruiting because they want their sex workers to be loyal only to them.

Recksiek also discussed the notebook found in the motel room Meeks and M.S. had been staying in on January 24, 2020. The third page had a list of goals: "Get 2 phones. Bank account. Car. Prescription. Glasses. Make my way to O.C. Courthouse to pay on ticket, or call and arrange payment plans, if possible, by the 19th. Pay wheels [or weelo] $500. Pay Brawn." The next page said "Ruby," for M.C., and had a list of adult websites and passwords. Page 12 had a similar list. It also said, "Five a day keeps the haters away." Recksiek explained that this appeared to be a quota indicating five clients a day to make money. Page 14 said "Daddy loves Maia forever," and was signed, "Christian Meeks, Daddy."

Page 19 was titled "R.R. House Rules," and Recksiek testified R.R. likely stood for Red Rose Entertainment. The rules listed included, "Respect my game." "Speak only when spoken to, aka, find time to express your mind." "Always be ready to put it in my hand only with smiles on demand." "Work with hard work and dedication, aka, no bitching and complaining." Recksiek testified that the third rule meant the girls should be willing to give Meeks their money, and should do so with a smile. Recksiek also testified that she had looked at other examples of Meeks's handwriting and most of the writing in the notebook appeared to be consistent with those examples.

Finally, in January 2021, Recksiek texted a phone number associated with Meeks. She said her name was Shawna and that she was looking for Rico. The two had a conversation over text and the People provided the transcript to the jury.

**B. Defense Case**

Meeks did not testify or present any witnesses in support of his defense. In closing argument, his counsel asserted the prosecution had not met their burden to prove the charged offenses.

**C. Verdict and Sentencing**

The jury found Meeks guilty of the counts 1 through 7 and count 9. They found Meeks not guilty on count 8 as charged, but guilty of a lesser included offense of attempted pandering, as to J.L. The trial court sentenced Meeks to a total aggregate term of 56 years, 8 months in prison.

Meeks filed a timely notice of appeal.

## II. DISCUSSION

Meeks assert the judgment of conviction must be reversed because there was insufficient evidence to support the convictions on counts 2, 5, 7, and 8, and because his trial counsel provided ineffective assistance by failing to object when Recksiek exceeded the scope of permissible opinion testimony. In addition, he asserts the trial court erred in sentencing him on count 7 and that the trial court should have stayed the sentences for counts 3 and 4 pursuant to section 654.

**A. Substantial Evidence Supports Each of the Convictions**

We begin with Meeks's assertion that there is insufficient evidence to support the convictions on counts 2, 5, 7, and 8.

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) "To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test." (*Ibid.*)

"The standard is deferential: 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence

14

to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).) Instead, we "presume in support of the judgment every fact the trier of fact reasonably could infer from the evidence." (*People v. Guyton* (2018) 20 Cal.App.5th 499, 506 (*Guyton*).)

### 1.    Count 2

To prove human trafficking as alleged in count 2, the People had to show that Meeks "deprive[d] or violate[d] the personal liberty of another with the intent to effect or maintain a violation of" one of several enumerated statutes associated with commercial sex work. (§ 236.1, subd. (b).) " ' "Deprivation or violation of the personal liberty of another" includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.' " (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1095 (*Oliver*).)

"When determining whether the victim's liberty was deprived or violated, and when determining whether a defendant used duress or coercion, the jury must consider '[t]he total circumstances' including a list of nonexhaustive 'factors' such as the victim's age, the relationship between the victim and his or her trafficker or the trafficker's agents, and any handicap or disability of the victim." (*Oliver, supra,* 54 Cal.App.5th at p. 1095, fn. 7.) This "nonexhaustive definition of deprivation or violation of personal liberty

15

leaves open the possibility that a victim may *agree* to have his or her freedom of movement limited by a pimp, for example, to help facilitate and share in the profits of a prostitution ring." (*Id*. at p. 1097.) "[C]onsent is not an element of the offense of human trafficking in violation of section 236.1(b), and [lack of consent] is not an affirmative defense." (*Ibid*.)

Meeks asserts there was insufficient evidence that he violated the personal liberty of M.S. He argues there was no evidence of how M.S. and Meeks met, the extent of their relationship, or that M.S. did not decide to join him in the motel room to prostitute herself willingly and without force or coercion. To the contrary, there was ample evidence of how Meeks operated, including how he attempted to recruit V.B., J.L., and U.C., and, specifically—how he used violence to intimidate both V.B. and J.L. In addition, J.L. testified that M.S. called Meeks "Daddy" and tried to recruit her. From this evidence, the jury could conclude that Meeks followed the same pattern with M.S. as he did with the other female victims. If the jury found, as it did, that Meeks committed the other charged offenses, it could conclude from that evidence that Meeks was predisposed or inclined to commit the other charged offenses, including the trafficking of M.S. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1166–1168.)

Moreover, there was also evidence that Meeks used physical force and other forms of coercion or control against M.S. When police arrived at the motel after J.L. reported the violent incident, M.S. was emotional and crying and had visible bruising on her face. During that same visit, the police recovered a notebook that contained lists of websites and accounts where M.S. was advertising prostitution and a list of "house rules." Rules like "speak only when spoken to" and that the women give any money they earn to Meeks, were indicative of control, coercion, and duress. There was also

16

evidence that the rules did govern the relationship between Meeks and M.S., including evidence that Meeks received payments to his Cash App based on commercial sex work performed by M.S., and M.S. opening the car door for Meeks while being careful not to make eye contact with any of the other men. When considered in totality, all this evidence supports an inference that Meeks was restricting M.S.'s liberty through coercion, control, and/or violence.

Meeks relies on *Guyton*—in which the court found there was sufficient evidence of human trafficking—to assert the People did not present similar evidence in this case that M.S. was afraid to leave, or that she was living in a restricted environment that kept her dependent on Meeks. (See *Guyton, supra,* 20 Cal.App.5th at p. 507 [court discussing "[t]he various restrictions defendant placed on [the victim], such as isolating her, constantly monitoring her, requiring her to stay in contact with him by phone, checking her phone, requiring her to work so much she was exhausted, falsely promising he had purchased a car for her and depriving her of the financial means to live"].) But the People did not need to provide the same type of evidence here as was provided in *Guyton*. Rather, the jury was to consider the totality of circumstances, including, among other things, M.S.'s age (19), her relationship with Meeks, and all the other evidence indicating Meeks's pattern of pimping through coercion and/or violence. (See *Oliver, supra,* 54 Cal.App.5th at pp. 1095–1097.)

Based on the foregoing we conclude there was sufficient evidence to support the conviction in count 2 for human trafficking of M.S. in violation of section 236.1, subdivision (b).

### 2. Count 5

To prove assault by means likely to produce great bodily injury as alleged in count 5, the People had to show that Meeks "did an act that by its

17

nature would directly and probably result in the application of force to a person" and that the "force used was likely to produce great bodily injury." (CALCRIM No. 875; § 245, subd. (a)(4).)

" 'The force likely to produce bodily injury can be found where the attack is made by use of hands or fists. [Citation.] Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied.' [Citation.] A solitary punch may violate section 245, subdivision (a)(4)." (*People v. Medellin* (2020) 45 Cal.App.5th 519, 528.)

J.L. testified that she called the police in January 2020 because M.S. asked her to after J.L. heard M.S. yelling for help and then saw M.S. in the doorway with a black eye. When police made contact with M.S. the next day, she was emotional and crying and had injuries to her eye and face.

Meeks asserts that there was insufficient evidence to support the conviction on count 5 because no one saw the assault and M.S. did not tell the police or the jury what happened. Thus, he argues, there was no evidence that he did any act or applied any force to cause M.S.'s bruised and bloody eye. Although M.S. did not testify directly, and the officer did not testify as to what she told him that day, J.L.'s testimony was circumstantial evidence of an altercation between Meeks and M.S., there was no evidence anyone other than Meeks and M.S. were present or involved, and there was no suggestion that M.S.'s injuries occurred because of an accident. Rather, M.S.'s request that J.L. call the police, and her emotional state when the police arrived, provided additional circumstantial evidence from which the jury could easily infer that Meeks applied force to M.S. by some mechanism

18

likely to produce great bodily injury, namely the bruise to her face and the rupture of blood vessels in her eye.

Meeks does not provide, nor are we aware of, any authority suggesting circumstantial evidence is not relevant or sufficient to prove assault by means likely to produce great bodily injury. (Cf. *People v. Kelly* (2007) 42 Cal.4th 763, 788 ["same standard of review applies [for claims based on the sufficiency of the evidence] when the evidence of guilt is circumstantial"].)

Accordingly, we conclude there was substantial evidence to support the conviction on count 5.

### 3. Count 7

Count 7 alleged that Meeks violated section 136.1, subdivision (b) by trying to dissuade J.L. from testifying.

Section 136.1, subdivision (b) provides:

> "Except as provided in subdivision (c) [aggravated dissuading], a person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:
>
> (1) Making a report of that victimization to a peace officer, a state or local law enforcement officer, a probation, parole, or correctional officer, a prosecuting agency, or a judge.
>
> (2) Causing a complaint, indictment, information, or probation or parole violation to be sought and prosecuted, or assisting in the prosecution thereof.
>
> (3) Arresting or causing or seeking the arrest of a person in connection with that victimization."

To prove that Meeks violated section 136.1, subdivision (b), the People had to prove that Meeks (1) attempted to prevent or dissuade J.L., (2) who

19

was a victim or witness to a crime, (3) from making any report of the crime to any peace officer or other designated officials.  (See *People v. Sherman* (2022) 86 Cal.App.5th 402, 411.)

J.L. testified that, in March 2020, Meeks called her a snitch, assaulted her while she was pregnant, and stated said "that's what [you] get.  That's what [you] need," as he was leaving.

Meeks does not dispute that the assault occurred but asserts there was insufficient evidence to support the conviction on this charge because it happened two months after J.L. called the police to report the assault of M.S.  But the People did not argue that Meeks was trying to dissuade J.L. from reporting the assault of M.S.  J.L. lived next door to Meeks and M.S. for months and also had information regarding the commercial sex work that was occurring in and around the room.  There was no indication in the record that J.L. had spoken to the police about the prostitution, or that Meeks had reason to believe that she had.  As Meeks points out, the prosecutor asserted J.L. "had additional information about what [Meeks] was doing next door" and that Meeks's intent was to "silence her further."  In other words, the prosecution's theory was that Meeks was trying to dissuade J.L. from talking to the police about *additional* crimes, such as the subsequently charged offenses of pimping, pandering, and human trafficking.

Meeks implicitly concedes that, at a minimum, the assault was in retaliation for her calling the police regarding his prior assault of M.S.  We acknowledge that retaliation after a report is not the same as assault for the purpose of dissuading a *future* report in all instances, but here, the evidence established that J.L. had *additional* information about *additional* crimes that she had not yet reported.  Indeed, J.L. testified that she did not want to come to court because she was afraid of Meeks and everything that had happened.

20

There is no dispute here that Meeks assaulted J.L. while his pimping activities were ongoing, and before she reported any additional information relevant to the present charges. (See, e.g., *People v. Sherman* (2022) 86 Cal.App.5th 402, 414 ["it will often be reasonable for a jury to conclude that, by preventing a victim from contacting the police to seek help during an ongoing crime, the defendant prevented the victim from reporting her victimization"].)

There was substantial evidence from which the jury could infer that Meeks was attempting to dissuade J.L. from reporting these additional crimes, and thus, to support the conviction on count 7.

### 4. Count 8

As to count 8, the jury found Meeks guilty of the lesser included offense of attempt to pander J.L. in violation of section 266i.

Section 266i, subdivision (a) states, in relevant part: "any person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years: (1) Procures another person for the purpose of prostitution. [¶] (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute."

"Pandering is 'the business of recruiting a prostitute, finding a place of business for a prostitute, or soliciting customers for a prostitute.' " (*People v. Campbell* (2020) 51 Cal.App.5th 463, 484.) Section 266i encompasses a broad range of conduct, and the intent of the Legislature was " 'to deter pimps or others from establishing new working relationships in the unlawful prostitution trade.' " (*Campbell*, at p. 485.) "The crime of pandering does not require that actual acts of prostitution take place." (*Id.* at p. 488.)

Here, the trial court instructed the jury that Meeks was guilty of the lesser included offense of attempted pandering if he "took a direct but

21

ineffective step toward committing pandering," with the intent to commit pandering. (See CALCRIM No. 460.) Meeks does not dispute the adequacy of this instruction. Rather, he asserts that the evidence established only that M.S. asked J.L. to join her in prostitution, and there was no evidence establishing M.S. did so at Meeks's request, or that Meeks himself took any steps towards pandering J.L.

To the contrary, it was reasonable for the jury to infer that M.S. was attempting to recruit J.L. *for* Meeks. J.L. said that she knew what was going on in the motel room and was therefore at least somewhat familiar with the commercial sex industry. She testified that Meeks would send M.S. her way and that she believed Meeks was trying to get her to prostitute for him. The People also provided expert testimony establishing that it was common for a "bottom girl" to recruit other women on behalf of their pimp. And there was additional evidence that Meeks sought to involve M.S. in the recruitment of another potential victim, U.C.

Finally, J.L. testified that Meeks tried to give her flowers on one occasion, which the jury could have interpreted as an act of grooming. To the extent Meeks asserts these actions could have been interpreted differently, he was free to argue that to the jury. We do not reweigh the evidence on appeal. (*Houston, supra,* 54 Cal.4th at p. 1215.)

For these reasons, we conclude there was sufficient evidence to support the conviction for attempted pandering in count 8.

## B. Ineffective Assistance of Counsel: Expert Testimony

Meeks contends that Recksiek improperly offered her expert opinion on the meaning of certain text messages, which the jury could have interpreted on its own; that certain conversations were consistent with pimping and pandering; and that certain text messages established that Meeks was a pimp. He acknowledges that his trial counsel did not object to any of this

22

testimony but asserts, to the extent this court concludes the arguments are therefore forfeited, that his trial counsel provided ineffective assistance of counsel.

### 1. Forfeiture

As an initial matter, we agree that Meeks has forfeited these claims by failing to object in a timely matter in the trial court. (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 717 [" 'It is, of course, "the general rule" '— which we find applicable here—' "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' "].) "A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal." (*People v. Marks* (2003) 31 Cal.4th 197, 228; see also Evid. Code § 353.) Here, the trial court made a ruling as to the scope of Recksiek's testimony in pretrial proceedings, but trial counsel still had to object to any specific testimony he believed exceeded the permissible scope in order to preserve the argument for appeal. In the absence of any such objection, Meeks has forfeited the claim and must proceed, instead, on the alternate theory of ineffective assistance of counsel.

### 2. Ineffective Assistance of Counsel

To prove ineffective assistance of counsel, Meeks must show his attorney performed below the standard of reasonableness under prevailing professional norms and that there is a reasonable probability the result would have been more favorable to him but for that substandard performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–688; *People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

"Ineffective assistance of counsel claims are rarely cognizable on appeal," as we give deference to trial counsel's tactical choices and the record

rarely provides information regarding trial counsel's strategy. (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329; *Strickland, supra*, 466 U.S. at pp. 690–691; *People v. Wilson* (1992) 3 Cal.4th 926, 936.) Where the record is silent as to counsel's motivation, the court must reject an ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Meeks asserts Recksiek's testimony exceeded the permissible scope of expert testimony, and that there could be no tactical reason for his counsel's failure to object to that testimony. We disagree.

Expert witness testimony in the form of an opinion is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code § 801, subd. (a).) "Like other evidence, expert testimony must be relevant and competent on a material issue, subject to exclusion, however, if unduly prejudicial." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 390.) Expert witnesses may not express an opinion as to the defendant's guilt, primarily because the jury, as the trier fact, is equally competent to weight the evidence and draw a conclusion as to the charged offenses. (*People v. Torres* (1995) 33 Cal.App.4th 37, 46–48.) However, " '[t]here is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507.) The issue ultimately comes down to whether the expert's testimony presents matters beyond the common experience of the jury. (*Ibid*.)

Meeks acknowledges that it was appropriate for Recksiek to testify about the culture of pimping, prostitution, and human trafficking, but asserts that she was prohibited from offering additional opinions about the meaning

24

of certain text messages, the nature of his relationship with M.S., and that he was actually pimping, pandering, and/or involved in human trafficking. But Meeks does not point to any testimony in which Recksiek directly stated that he was guilty of any crime.

Rather, Meeks points, in many instances, to testimony in which Recksiek provided her expert opinion on the meaning of certain language and behaviors.[5] For example, in one instance, the prosecutor presented Recksiek with a transcript of text messages involving M.S. After reviewing some of the terminology used therein, the prosecutor asked Recksiek "what does this conversation mean to you?" Recksiek responded by explaining it appeared to be M.S. agreeing to an "outcall." In another instance, Recksiek explained terms like "work ready" and "tap in" meant the female sex worker was ready to conduct commercial sex work. These were terms, or practices, members of the jury were not likely to be familiar with.

In a few instances, Recksiek's testimony did come closer to the ultimate issues in the case. For example, Recksiek testified that a certain conversation showed that Meeks "is preparing [M.S.] for commercial sex work," and that Meeks "appears to be trying to get someone to work with him and prostitute for him." In another instance, Recksiek testified that M.S.'s behavior suggested "she was obviously told how to respect him, how to treat him, and it's his way of being in charge." Again, though, these opinions were based on Recksiek's expertise in human trafficking, including her knowledge

---

5    Meeks sets forth a great deal of specific testimony in the background portion of his brief and then makes general arguments concerning that testimony in the legal section. We have considered the totality of Recksiek's testimony in our analysis herein but note that, for the most part, Meeks does not make specific arguments about specific testimony.

of commonly used language, patterns, and prices for commercial sex services. With this specialized knowledge, Recksiek was able to draw conclusions about specific conversations or behaviors that a lay juror may not be as familiar with. Such testimony may have been helpful to the jury, and generally did not go so far as to suggest that Recksiek believed Meeks was guilty of any specific offense.

In any event, the jury was able to read the text messages and view the video footage themselves and were able to determine whether they agreed with Recksiek. To the extent they believed they could understand what was happening, or being discussed, without needing to rely on the explanations offered by Recksiek, they were free to reach their own conclusions. Along those same lines, the trial court instructed the jury with CALCRIM No. 322, telling them that it was up to them to determine the meaning and importance of any expert testimony, just like they would with any other witness. (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 493–494 [finding any error in admitting expert testimony regarding type of pimp defendant was to be harmless given a similar instruction].)

For these same reasons, it would have been a reasonable tactical decision for Meeks's trial counsel to withhold an objection. A decision on any such objection would be left to the sound discretion of the trial court and counsel reasonably could have believed that making an objection would look obstructive or serve only to draw further attention to Recksiek's testimony. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [no ineffective assistance of counsel where counsel's failure to object could have been a tactical decision not to draw attention]; *People v. Prince* (2007) 40 Cal.4th 1179, 1223 [courts permit a broad range of expert testimony in criminal

matters, notwithstanding the jury's ability to examine "other evidence to form their own commonsense conclusions"].)

In sum, we conclude Meeks has not established that his trial counsel provided ineffective assistance by failing to object to any specific testimony provided by Recksiek.

## C.    Sentencing

Meeks raises two independent arguments regarding sentencing. First, he asserts the trial court erred by imposing a full consecutive term on count 7. Second, he asserts the matter must be remanded for resentencing because the trial court should have stayed the sentences on counts 3 and 4 under section 654. The People assert that the jury also made a true finding on an allegation related to count 7 and, based on that allegation, the trial court did not err. They concede the sentences on counts 3 and 4 should be stayed but assert that this court can modify the judgment without the need for a full resentencing. Meeks does not respond to these arguments in his reply brief.

### 1.    The Trial Court Did Not Err in Sentencing Meeks on Count 7

In the first amended information, count 7 alleged that Meeks violated Penal Code section 136.1, subdivision (b) by dissuading J.L., but also alleged that he committed that offense "knowingly and maliciously by means of force and by an express or implied threat of force and violence . . . within the meaning of [section] 136.1, subdivision (c)(1)." As noted in the amended information, the latter carries a sentencing triad of 2, 3, or 4 years in prison. (§ 136.1, subd. (c)(1).) The jury found Meeks guilty on count 7 *and* found the additional allegation true.

In addition, Section 1170.15 provides that for a person convicted "of an additional felony that is a violation of Section 136.1 or 137 and that was committed against the victim of, or a witness or potential witness with

27

respect to, or a person who was about to give material information pertaining to, the first felony . . . the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full middle term of imprisonment for the felony for which a consecutive term of imprisonment is imposed."

At sentencing, the trial court explained, "Count 7, pursuant to Penal Code section 1170.15, the subordinate term for each consecutive offense consists of the full middle term of imprisonment, in this case three years, which is doubled due to the strike prior for a total of six years to run consecutive to Count 1."

We find no error in the trial court's sentencing on count 7.

### 2.    The Sentences for Counts 3 and 4 Are Stayed

Section 654 subdivision (a) states:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

As our Supreme Court has explained:  "Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct.  [Citation.]  'The proscription against double punishment . . . is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute . . . .  The divisibility of a course of conduct depends upon the intent and objective of the actor.' " (*People v. Miller* (1977) 18 Cal.3d 873, 885).  " '[I]f all the offenses are incident to one objective, [then] the defendant may be punished for any one of them but not for more than one.' " (*Ibid.*)

Here, Meeks was convicted in counts 2, 3, and 4 of human trafficking, pimping, and pandering, each related to M.S. and each during the same

28

period from April 2019 to August 2020.  The People concede, and we agree, that, given the specific factual scenario presented here, including that all three offenses were charged for the same period and that none relied on one specific act, the pimping offense was incidental to the pandering offense, and the intent to pander was an essential element of the human trafficking charge.  (See, e.g., *People v. Deloach* (1989) 207 Cal.App.3d 323, 337 ["as a general rule, any acts of prostitution that follow directly or proximately from the pandering are incident to a single objective and therefore constitute an indivisible transaction with it; that is, the subsequent sex offenses are incidental to the commission of the pandering, and are facilitated by it"]; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 263 ["As charged under the facts of this case, the human trafficking and [pandering] were part of the same criminal 'intent and objective' [citation], and thus the court was required to stay the sentence on the [pandering] count.  The human trafficking charge literally has an element of an intent to [pander]."].)

Accordingly, the trial court should have stayed the sentences on counts 3 and 4 pursuant to section 654.  Meeks asks us to remand the matter for resentencing based on this error, but we agree with the People that resentencing is not necessary.  Rather, we exercise our authority to modify the judgment to reflect that the punishments on counts 3 and 4 are stayed pursuant to section 654.  (§ 1260 [appellate court may reverse, affirm, or modify judgment]; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473, [court may exercise its authority to modify a judgment based on an unauthorized sentence under section 1260 in the context of section 654].)

### III.  DISPOSITION

The judgment is modified to reflect that the punishments on counts 3 and 4 are stayed pursuant to section 654.  The matter is remanded to the

29

trial court with directions to prepare an amended abstract of judgment and forward to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KELETY, J.

WE CONCUR:

McCONNELL, P. J.

CASTILLO, J.